Argued October 20; decided December 21, 1896; rehearing denied.

## In re JOHN'S WILL.

(36 L. R. A. 242; 47 Pac. 341.)

Probate of Will Appointing Executor.—A will that appoints an executor is entitled to probate, regardless of whether it purports to dispose of anything or not.

Conclusiveness of Order Probating Will.—It sometimes happens that in proceedings to probate a will, other issues are tendered and heard besides those ordinarily involved (i. e., testamentary capacity and formality), and when such are heard and determined, they will become conclusive between the parties involved.

Jurisdiction of County Courts to Construe Wills—Code, §§ 895, 1191.—A court having power to control the conduct of executors, to settle their accounts, to direct the payment of debts and legacies, and to distribute estates, such as is conferred by sections 895 and 1191 of Hill's Code of Oregon, has, by necessary implication, the further power to construe wills so far as they dispose of personalty, and, probably, also as to real property, though this is not so certain.

Proceedings to Secure Construction of Wills.—A probate court ought not to entertain a proceeding instituted merely for the purpose of having a judicial construction of a will; the interpretation of such an instrument should be only a step in the attainment of some other object. This rule is analogous to the well-established practice in equity: Edgar v. Edgar, 26 Or. 65, cited.

Probate of Will Partially Void.—A will, appointing executors and directing the payment of funeral expenses and the expenses of administration, is entitled to probate, though its other provisions creating a charitable trust are invalid.

Proceeding to Revoke Probate of Will.—When the probate court has jurisdiction to direct and control the conduct and settle the accounts of executors, such as is conferred by section 895 of Hill's Code, a petition for the revocation of the probate of a will, instituted several years after the original probate, during which time the executor has been antagonistic to the interests of the petitioners, may be considered as a prayer for the direction of the executor in the administration of the personalty.

Public Charity—Schools.—A gift for the maintenance of free public schools is clearly a gift to a legal charity, and the object and the beneficiaries are as certain as the rules governing charitable trusts require: Pennoyer v. Wadhams, 20 Or. 274, cited and applied.

Charitable Trust For Public Schools.—The fact that by law provision has been made for the maintenance of public schools in all school districts, without making it, however, compulsory on the district to maintain such schools, does not render invalid a bequest in trust for the maintenance of a public school.

Equity Jurisdiction Over Trusts.—Courts of equity in this country, except when prohibited by statute, exercise original inherent jurisdiction over charitable trusts: *Pennoyer* v. *Wadhams*, 20 Or. at page 279, cited and applied.

Charitable Trusts—Rule Against Perpetuities.—A charitable trust is not invalid, as against the rule of perpetuities, because the will provides for the appointment of trustees fifteen years after testator's death, the property in the meantime being given in trust to the executors, for the gift was absolutely and at once to charity, and falls under the exception to the rule.

Gifts to Charity—Succession of Trustees—Equity.—A charitable trust will not be permitted to fail because the trust may outlive the trustees who are appointed to administer it *(Brown* v. *Brown,* 7 Or. 285, cited); for charity is ever a favorite of equity, and a valid trust of that kind will not be suffered to lapse for mere want of a trustee. So, if a donation to charity is immediate and absolute, and a competent trustee is appointed to take, the other conditions being sufficient, a trust arises at once, the property becomes impressed with it, and immediately passes beyond the reach of the heirs or residuary legatees.

Charitable Trusts—Uncertainty of Trustees.—A charitable trust is not invalid on account of the uncertainty of the trustees, because fifteen years after testator's death, the property in the meantime being given in trust to the executors, the trustees are to be appointed, one each by the incumbent judges of the State Circuit Court and of the Federal District Court, and a third by the two so appointed, and vacancies to be filled by persons appointed by the incumbents of such judgeships.

Jurisdiction of Equity to Appoint Trustees.—A failure to act on the part of persons authorized to appoint the trustees of a charitable gift will not result in a failure of the trust, for equity will appoint and see that the wishes of the donor are carried out.

Gift to Charity a Charge on Lands Devised.—The fact that no provision was made in a will for the conveyance to the trustees of certain land therein given the executors in trust will not defeat the trust, as such land would be charged with the trust in either the hands of the executors or heirs.

### On Motion to Correct Decree.

Undertaking for Costs on Appeal.—Under a bond "to pay all costs and disbursements that may be awarded against them on * * * appeal," given to perfect an appeal from an inferior court to the Circuit Court, the sureties are not liable for any expenses incurred by a further appeal to the Supreme Court.

From Multnomah: Loyal B. Stearns, Judge.

This is a proceeding by the heirs of James John, deceased, against Philip T. Smith, executor of the will of said John, involving the validity of certain charitable be-

quests contained in such will. The County Court, where the proceeding was commenced, sustained the will as it was written, and on appeal to the Circuit Court the decision was affirmed, from which the petitioners appeal.

Affirmed.

For appellants there was a brief over the names of *J. F. & E. B. Watson*, and *W. W. Thayer*, with an oral argument by *Messrs. Edward B. Watson, William W. Thayer,* and *Joseph N. Dolph*.

For respondents there was a brief over the names of *Catlin & Catlin, Edward N. Deady*, and *Nicholas & Davis*, with an oral argument by *Messrs. John Catlin* and *H. B. Nicholas*.

Opinion by Mr. Justice Wolverton.

This proceeding was instituted in the County Court of Multnomah County by the next of kin of James John, deceased, for the purpose of having revoked an order or decree of said court, made and entered July 29, 1886, admitting to probate in common form what purports to be his last will and testament. The following is a copy of the will, omitting formal parts and attestation:

"First—I do hereby give, bequeath, and devise all money, property, and estate, real and personal, of every kind and nature, of which I may die seized or possessed, or be entitled to at the time of my death, and wheresoever situate or being, to my executors hereinafter named, to and for the following uses and trusts, that is to say: (1) To sell and convert all my personal property into cash, at private or public sale, as to them shall seem best. (2) To lease all my real estate, except that certain block hereinafter mentioned, upon such terms and for such times and in such parcels as they may deem to the best interest of

my estate, but all leases shall terminate fifteen years after the date of my death. (3) After the payment of my funeral expenses, and the expenses of administration upon my estate, to expend all other moneys which shall come to their hands upon my death, from the sales of personal property, or from rents of real estate, in the erection of buildings for school purposes upon block No. 29, in the town of St. Johns, Multnomah County, State of Oregon, and employing teachers to teach the common school branches. (4) To sell all real estate fifteen years after the date of my death, and not before, excepting said block 29, and such other lots and blocks as they may deem necessary for school buildings and grounds, at public or private sale, with or without an order of court, and upon such terms as they may deem advisable, and the proceeds arising from such sales to be delivered to trustees to be appointed as hereinafter provided. If such sales shall not be for cash, then the notes and securities shall be turned over to such trustees. (5) It is my intention that all taxes, claims, charges, and expenses shall be paid out of money coming into the hands of my executors from other sources than from sales of real estate, and that only the remainder shall be used by them in erecting school buildings and supporting schools. (6) The sales of real estate hereinbefore mentioned to be made by my executors shall be made within eighteen years after my death, and not until fifteen years after my death. (7) It is my desire that my estate shall be used in establishing and maintaining free schools or school in the town of St. Johns; and that such schools shall be public, and at all times open to children of the school district, which shall embrace the town of St. Johns; and, if my executors shall consider it to the best interests of the children of said town and district, they may act in concert with the directors of said school district in erecting schoolhouses and

maintaining schools, but any and all buildings erected with money belonging to my estate shall belong to my estate, and not to the district, and all moneys expended in maintaining schools shall be expended under the supervision of my executors as long as they shall continue to act, and until the trustees hereinafter mentioned and provided for shall be appointed and qualify.

"Second—I do hereby nominate and appoint my friends, Philip T. Smith, of St. Johns, C. W. Burrage and P. A. Marquam, of Portland, executors of this my last will and testament, and in case either of them shall fail to accept the trust, I do hereby suggest my friend, John Catlin, to act as executor in the place of the one failing to accept.

"Third—It is my will that fifteen years after my death three trustees be appointed, as follows: One by the judge of the Circuit Court of the State of Oregon, in whose judicial district the town of St. Johns may be in; one by the person who shall be district judge of the United States in whose judicial district the town of St. Johns may be in; and the third shall be appointed by the two persons acting as such judges; and the three persons appointed as such trustees shall be and constitute a board of trustees, and such board shall have the possession, management, and control of all moneys and property by them received from my executors, for the purpose of promoting educational interests in the town of St. Johns, and to that end shall use such money and property so as to establish a permanent fund, the interest only to be used in educational purposes, or so much thereof as shall be necessary. The principal to be loaned only upon real estate security. A portion of the principal, which shall be in excess of fifty thousand dollars, in the discretion of such trustees, may be used in erecting buildings for educational purposes, and in employing teachers.

"Fourth—The persons acting as judges aforesaid, may from time to time make rules and regulations for the government of the board of trustees, which rules and regulations shall be binding upon such board, and they may fix the qualifications of such trustees, and determine whether or not they shall give security for the faithful performance of their trusts, and to whom such security shall be given.

"Fifth—It is not my intention to direct the particular branches of education which shall be taught, nor in any way limit the use of the money in promoting certain kinds of education, only I desire that it shall never be used to inculcate the doctrines of any religious sect or denomination, one more than the other.

"Sixth—It is my intention and desire to establish a permanent and perpetual educational fund, to be forever used in promoting education.

"Seventh—Whenever a vacancy shall occur in the board of trustees hereinbefore mentioned, such vacancy shall be filled by appointment to be made by the persons occupying the positions of judges as aforesaid. Said board to be always kept full, and to consist of three persons, a majority of whom may transact business."

The petition for the revocation of the order of probate is based upon two grounds: First, the want of testamentary capacity of the testator; and, second, the insufficiency of the attempted devise to charitable purposes, as it respects the objects and beneficiaries of the charity and the trustees in whom the power of administering the charity is reposed. The first ground of contest was abandoned at the trial, and the case is here for determination upon the latter ground only. It is contended by the executor that, the will having been properly executed, and provision made therein for the appointment of executors and the payment of debts, it was properly admitted to probate, and that this proceeding is without merit, even if

it be conceded that certain gifts or devises are void and of no effect for any purpose. It is said to be no objection to the probate of a will that some of its provisions are not valid or susceptible of being carried into effect: 3 Redfield on Wills and Executors, § 3, subd. 22; and *Baxter's Appeal*, 1 Brewster, 460. Again, it is considered to be well settled that a will, appointing an executor and making no disposition of personalty, is entitled to probate, whether it contains any disposition of real estate or not: 3 Redfield on Wills and Executors, § 4, subd. 15. By the older English books it was established that, if an instrument be testamentary, and is to operate upon personal property, probate must be obtained, whatever its form, but that a will which clearly respects lands ought not to be probated; while if the will was concerning both land and personal property probate was proper, though such probate was without prejudice to the heirs of the land: Schouler's Executors and Administrators, § 59. The ancient law proceeded upon the theory that there could be no proper testament without the naming of an executor, but modern jurisprudence stands in support of the will whether an executor is nominated therein or not, and yet the nomination of an executor is sufficient to make the instrument a will. It is not uncommon for a testator to make his will for the sole purpose of nominating an executor to administer his estate. A fundamental rule long established is that the personal property of a deceased person goes to his personal representatives, while the real estate goes to his heirs at law. At one time it was thought that realty could not be diverted from the channel of inheritance by devise, but that doctrine no longer prevails; so that a person may now dispose of his real as well as personal property at will. Under the old law, it was the province of ecclesiastical courts to assume jurisdiction touching the administration of the goods and chattels of deceased

persons, while the English chancery guarded with much jealousy its peculiar jurisdiction over the realty. But by statutory enactments in England, as well as in most of the United States, the discrimination between wills of real and personal property is abolished; their probate has become a necessary process to the establishment of title to either style of property, and is effectuated by the same method and in the same court: Schouler's Executors and Administrators, § 59. Accordingly, it has been held, under the statutes of this State, that the transfer of the title to the personal property of deceased persons is accomplished through the sole instrumentality of the court *(Winkle* v. *Winkle,* 8 Or. 193), and that a will must be admitted to probate before title to realty can be established under it: *Willamette Co.* v. *Gordon,* 6 Or. 175; and *Jones* v. *Dove,* 6 Or. 188. The will here assumes to dispose of both personal and real property.

The ordinary functions of a court of probate, acting upon a proceeding for the probate of a will, seems to determine two things only, viz.: the testamentary capacity of the testator, acting without restraint, and the sufficiency of the formalities observed in the execution of the instrument propounded as his last will and testament; in other words, whether the instrument propounded is the testator's spontaneous act expressing his last will in the form prescribed by law: Woerner's American Law of Administration, § 222; *Hegarty's Appeal,* 75 Pa. St. 516. Mr. Schouler says: "To construe a will duly probated, and define the rights of parties in interest, remains for other tribunals; they must interpret the charter by which the estate should be settled in case of controversy; while the probate court, by right purely of probate or ecclesiastical functions, establishes and confirms that charter": Schouler's Executors and Administrators, § 85; *Hawes* v. *Humphrey,* 9 Pick. 350 (20 Am. Dec. 481). No doubt exists

but that a will may be probated in part, but the question usually involved in such cases is whether any certain clause forms a part and parcel of the instrument, or was interpolated by a fraud upon the testator, or without his knowledge, after the will had been formally signed and attested: *Allen* v. *McPherson*, 1 H. of L. Cases, 191; *Harrison's Appeal from Probate*, 48 Conn. 202; *In re Welsh*, 1 Redfield Sur. 238; *Plume* v. *Beale*, 1 P. Wms. 388; *Morrell* v. *Morrell*, 7 Prob. Div. 68; and Schouler's Executors and Administrators, § 85. A distinction seems to have been taken between the testamentary incapacity arising from the person, and that which may arise from the nature of the subject-matter of the legacies or devises. The former is made to appear by evidence dehors the will, while the latter is apparent upon the face of the instrument itself; and where the record of the probate shows that the court has passed upon the question of fact touching the testator's personal capacity, its decree becomes conclusive of that question, but where the invalidity of the will, or some particular bequest or devise therein, is apparent from an inspection of the instrument, the matter is one of construction, and no action of a court of probate can change their effect: *Hegarty's Appeal*, 75 Pa. St. Rep. 516, and *Bent's Appeal from Probate*, 35 Conn. 523. These cases are pertinent in so far as they announce a rule applicable to the effect of the ordinary decree admitting a will to probate under the issues usually involved, that of testamentary·capacity and the observation of due formality; but it does not follow that other matters may not be put in issue touching which the decree may not be conclusive. To illustrate: In *Dickinson* v. *Hayes*, 31 Conn. 417, a minor, between seventeen and twenty-one years, had made a will disposing of both real and personal property. Such a person could, by statute, dispose of personal property by will, but was incapacitated from so disposing of real estate. The decree of

probate was, in effect, that an instrument purporting to be her will "was presented in court for probate, and, having been duly proved, was approved, accepted, and ordered to be recorded." The question arose in that case, which was an action of ejectment, whether the decree was conclusive as to the testamentary capacity of the testatrix to devise real estate. The court held that it was not, because her capacity in that regard was not necessarily involved in the issue, nor was it necessary to infer that she had attained the age of twenty-one years at the time the will was executed, but that it was sufficient to uphold the order in general terms admitting the will to probate that she was above seventeen years of age, as the will was good in respect of the personalty. The inference is strong, however, that had there been an issue directly raised in the proceedings for the probate of the will as to testatrix's capacity to devise real property, it would have been decisive in the ejectment case. So we take it that issues within the jurisdiction of the court, other than those ordinarily involved in the probate of a will, may be tendered and heard at the same time, and, when heard and determined, will become conclusive, at least in so far as they affect the parties to the record or their privies.

But our probate courts are not entirely without authority or jurisdiction to construe wills, and more especially as it respects the disposition of personal property. By statute (Hill's Code, § 895, subds. 1, 2, 3, 4, and 5), the County Court is invested with exclusive jurisdiction, in the first instance, pertaining to a court of probate, in the following particulars: "1. To take proof of wills; 2. To grant and revoke letters testamentary of administration and of guardianship; 3. To direct and control the conduct and settle the accounts of executors, administrators, and guardians; 4. To direct the payment of debts and legacies, and the distribution of the estates of intestates;

and 5. To order the sale and disposal of the real and personal property of deceased persons." There is here involved, in the power to direct and control the conduct and settle the accounts of executors, and to direct the payment of debts and legacies, an implied jurisdiction to construe bequests, and thereby determine who shall take, for the very obvious reason that it is a necessary and unavoidable step in the direction of the distribution among legatees under a will. By section 1191 of our Code it is provided, in effect, that after the payment and satisfaction of all charges and claims against the estate, the court or judge thereof shall direct the payment of legacies and a distribution of the remaining proceeds of personal property among the heirs and other persons entitled thereto. Here is a positive enactment requiring the court or judge thereof to direct the payment of legacies, but before it can exercise that power it must determine who the legatees are, and the nature and amount of their respective shares, and this it must do by an inspection of the will and a consideration of the bequests. In short, it must construe the will in order to intelligently comply with these requirements. Under a similar statute, in Michigan and other states, it has been held that the probate court has jurisdiction to construe wills, such power being necessarily involved in the power to assign the estate of the testator on the settlement of the executor's account: *Glover* v. *Reid*, 80 Mich. 228 (45 N. W. 91); *Byrne* v. *Hume*, 84 Mich. 185 (47 N. W. 679), S. C. 86 Mich. 546 (49 N. W. 576); *In re Verplanck*, 27 Hun. 609; *Siddall* v. *Harrison*, 73 Cal. 560 (15 Pac. 130); *In re Hinckley's Estate*, 58 Cal. 518; *Hill* v. *Bloom*, 41 N. J. E. 276 (7 Atl. 438). The jurisdiction of the County Court to construe a will as it pertains to real property is not so apparent. Such property descends to the heirs, subject to the debts of decedent, and yet it would seem that, if there be any surplus of the proceeds of

the sale of real property sold for the payment of debts
and legacies, the court must direct the distribution there-
of (Hill's Code, § 1192); and in this particular, and possibly
in others, such as upon application for an order to sell and
an order to confirm a sale under a power, its jurisdiction
would extend to the construction of such a will, because
it is a necessary yet incidental step in considering the ap-
plication.  So it may be considered that the County Court,
in the transaction of probate business, has jurisdiction for
the construction of wills, as it respects bequests, and pos-
sibly, in special cases, as to devises.

There is a rule of equity which inhibits the assump-
tion of equitable jurisdiction for the sole purpose of con-
struing a will, and the jurisdiction will not be exercised
unless there exists some special reason for seeking its inter-
position other than a mere desire to obtain the opinion
of the court touching the proper interpretation of such
an instrument:  *Edgar* v. *Edgar*, 26 Or. 65 (37 Pac. 73);
*Siddall* v. *Harrison*, 73 Cal. 560 (15 Pac. 130); and *Crosby*
v. *Mason*, 32 Conn. 482.  "The reason," as stated by LORD,
C. J., in *Edgar* v. *Edgar*, "is that the decision of such ques-
tions is purely legal, and equity will not assume jurisdic-
tion to declare legal titles, unless it has acquired jurisdic-
tion of the case for some other purpose."  See *Bowers* v.
*Smith*, 10 Paige, Ch. 193.  Probate jurisdiction being in
its nature equitable, by analogy of this rule the probate
court should not entertain a proceeding instituted for the
mere purpose of obtaining the opinion of the court touch-
ing the construction of a will, even in those matters where-
in it has jurisdiction to interpret.  There should be some
special purpose to be attained, and the interpretation
should come as a means of granting the relief sought.
Such questions ought to find solution only as they are in-
volved in litigation touching actual dispute, as it is difficult
and often impossible to construe any instrument gen-

erally, so as to meet all contingencies that may arise under it. The point of attack, or the peculiar applicability to the particular purpose in hand, ought to be present in the mind of the court, so that its opinion concerning the dispute will merit respect as a precedent, and arise to the dignity of an adjudication.

We come now to the purpose of the present proceeding. It is primarily to obtain the revocation of the order of the County Court admitting to probate the will of the late James John, or as to such bequests or devises thereunder as were incompetent for the testator to make in the manner adopted by him. It does not go to his personal incapacity, as this branch of the contest was abandoned on the trial, but challenges the sufficiency of the act done; in other words, the adequacy of the instrument to accomplish the alleged purpose in hand. The defect, if any exists, is patent and inherent, and the test of its adequacy is purely a matter of construction. The proceeding casts upon the proponent the burden of reprobating the will by original proof in the same manner as if no probate had been had: *Hubbard* v. *Hubbard*, 7 Or. 42. The proof offered is ample, and the will is undoubtedly entitled to probate; it was made by a person possessing testamentary capacity, is sufficient in form, appoints executors, and directs the payment of funeral expenses and expenses of administration.

But should its probate here comprehend the approval or disapproval of the attempted disposition of the estate to the purposes of charity? There is some doubt whether the occasion has arisen for the exercise of the court's jurisdiction to construe this will. Certainly not as it may affect the disposition of real property, as no conditions exist whereby a court of probate is called upon to act concerning it. But, as it affects the personal property, may not the proceeding be considered in the light of a prayer for the direction of the executor in the administration

thereof? We believe we are justified in so considering it, in view of the fact that the court has the authority "to direct and control the conduct and settle the accounts of executors," and that such proceeding was not instituted until more than five years after the original probate of the will in common form, during which time the executor has presumably been proceeding in a manner antagonistic to the alleged interests of the objectors. So that it is with some hesitancy we proceed to construe the will as it affects the personal property and the executor's duties respecting it, and, however it may incidentally affect the disposition of the real property, we disclaim any attempt to adjudicate touching its construction as it pertains to that particular class of property.

The purpose of the testator was to establish and maintain a school or schools within the town of St. Johns, which should be free and public, and at all times open to the children of the school district which shall embrace such town. That a bounty in support of such a school or schools would be a public charity needs no argument or authority to demonstrate or establish. It comes within the letter and spirit of all definitions of a legal charity: *Pennoyer* v. *Wadhams*, 20 Or. 274 (11 L. R. A. 210, 25 Pac. 720). The object is definite, and the beneficiaries as certain as the rules governing charitable trusts require.

Nor is it any the less a charity because, as contended by counsel, the State has for all practical purposes provided for the maintenance of free public schools for all children of school age within the same territory: *Green* v. *Blackwell*, 35 Atl. 375. The bounty of the State for the support and maintenance of common schools is a creature of governmental policy, and subject to the will of the people. They may change, modify, or even abrogate the policy, subject to the provisions of the fundamental law respecting it, and the constitution itself may in time be

superseded by another. The framers of the constitution
have wisely provided for the accumulation of an irreducible
common school fund from the proceeds of lands granted
to the State for educational purposes, from the proceeds
of escheats and forfeitures, and gifts, devises, and bequests
made to the State for common school purposes, and
other sources, the interest arising from the investment of
which is exclusively applied to the maintenance of common
schools. The revenues arising from this source are as
yet insufficient for the support and maintenance of free
schools throughout the State during the entire school
year. For the purpose of supplementing this fund, the
legislature has provided for the levy of a four-mill tax in
each county (Hill's Code, § 2785). Beyond this, individual
school districts may supplement the fund so as to make
the schools absolutely free to the children of school age
within such districts. So it may be said that ample provision
is made by law for the support and maintenance of
free schools in all the districts within the State. But,
with all this, it is not compulsory with any district to levy
a tax for the support of free schools within its territory,
and it may, by neglect to have a school taught for one
quarter in each year, forfeit all right for the time being to
the school funds derived from whatsoever source. So that
it may be readily seen that even the system provided by
the State, while worthy of commendation, and free schools
may be maintained under it in all the districts, does not
guarantee that such schools shall be so maintained, and
there is no absolute assurance under the law that a free
school will be maintained within the district embracing
the town of St. Johns. Hence, there are, in fact, no conditions
provided for by the State which will assuredly and
inevitably meet the purposes of the testator. If the time
should come when, by reason of the State's regulation of
the public school system, the object of the bounty should

substantially fail, then another question would arise, involving, perhaps, the cy pres doctrine; but, suffice it to say, that at this time the object of the testator's charity is not essentially supplied or superseded.

We come, now, to a construction of the will for the purpose of ascertaining the effect of its provisions touching the disposition of the personal property of the testator. As we have seen, the bequest was for a charitable purpose, but the question with which we have to deal is whether the method which was adopted by the testator is sufficient in law to effectuate the purpose. The bequest is direct to executors named, to and for certain uses and trusts, viz.: To convert into cash; to lease the real property for fifteen years; to expend all moneys which shall come into their hands, together with the proceeds of sales of personal property and rents of real estate, after payment of taxes and charges of administration, in the erection of buildings for school purposes upon block 29; to sell all real estate, except block 29, and such other lots and blocks as they may deem necessary for school buildings and grounds, between fifteen and eighteen years after the testator's death; and to deliver the proceeds, whether in cash or notes with sureties, to other trustees, to be appointed fifteen years after the testator's death, in manner following: One by the judge of the Circuit Court of the State of Oregon in whose judicial district the town of St. Johns may be, one by the person who shall be district judge of the United States in whose judicial district the town of St. Johns may be, and a third by the two persons acting as such judges; such persons so appointed shall constitute a board of trustees who shall have the possession, management and control of all moneys and property by them received from the executors. The persons acting as judges aforesaid may from time to time make rules and regulations for the government of the board which shall

be binding upon them, and they may also fix the qualifications of the trustees, and determine whether and to whom they shall give security for the faithful performance of their trust. It is further provided that whenever a vacancy shall occur in such board of trustees it shall be filled by appointment to be made by the persons occupying the positions of judges aforesaid; such board to be always kept full, and to consist of three persons, a majority of whom may transact business. It is a familiar doctrine, which holds good in moral ethics as well as in legal policy, that the will of the testator should, when ascertained, be upheld and given effect whenever it is possible, having regard for fixed rules of law, long established, of which every person is bound to take cognizance. The discussion goes somewhat to the powers of a court of equity as the jurisdiction is exercised in this State, the real question being whether or not the executors—and, succeeding them the board of trustees, the appointment and perpetuation of which as a board is provided for by the testament—are competent trustees to administer the charity. In other words, does the will appoint and provide for the naming of such trustees as are competent to take hold of and administer the charity in the manner directed? And, if not, should a court of equity provide trustees, and entrust them with the administration of it? In *Trustees of M. E. Church* v. *Adams,* 4 Or. 77, it is held that "Equity jurisdiction, as administered by the courts of this State, derives its authority from the constitution and laws of Oregon, and includes only the ordinary jurisdiction of the court of chancery of England, modified and extended by the statutes of this State, and the changes in the condition of affairs of the community." In the latter case *(Pennoyer* v. *Wadhams,* 20 Or. 274, 11 L. R. A. 210, 25 Pac. 720), Mr. Justice Bean, after discussing the question whether or not the peculiar equitable jurisdiction over charities, as distinguished from the juris-

diction touching ordinary trusts, was derived solely from the statute of 43 Elizabeth, chapter 4, says: "It may then be stated, as a proposition supported by the great weight of authority in this country, that courts of equity in the various states, where they are not prohibited by statute, exercise an original inherent jurisdiction over charitable trusts, and apply to them the rules of equity, together with such other rules as may be applicable under the laws of the several states; and this they do by virtue of their inherent powers, without reference to whether the statute of Elizabeth has been adopted in this State." These authorities render it unnecessary to enter into a discussion of the once-disputed question touching the origin of equitable jurisdiction as it respects the peculiar doctrine governing charitable trusts.

It is contended by the objectors to the will that the property has not been given to a person sufficiently certain having capacity to execute the trust imposed. It is somewhat difficult to determine from the books what is required in this respect. The bequest is directly to the executors named, and thus far there is undoubtedly sufficient certainty as it regards the appointment of trustees. It is admitted by appellants that if this were all the will contained it would be sufficient in that respect. But it is urged that there is a scheme connected with the execution of the trust whereby the testator has attempted to create a trustee, an entity, and to devise the manner of its perpetuation, all which is unknown to the law; that the entity is not a person, either real or artificial, and that the mode of its perpetuation is a thing which the law does not recognize; and that, taken as a whole, he has failed in his appointment of a trustee sufficiently certain and capable of recognition with capacity to execute the trust. It is said that the rule against perpetuities has no application to charitable trusts. It is, indeed, a striking charac-

teristic of such trusts that they continue forever. They are not, however, exempt from the rule, barring one very important exception. The word "perpetuity" has a technical signification, denoting the period of time beyond which a future interest cannot vest: 18 Am. & Eng. Enc. Law (1st Ed.), 362. "It may," says Mr. Sanders, "be defined to be a future limitation, restraining the owner of the estate from aliening the fee of the property, discharged of such future use or estate, before the event is determined or the period arrived when such future use or estate is to arise. If that event or period be within the bounds prescribed by law it is not a perpetuity": Sanders' Essay upon Uses and Trusts, 196, cited in *Perin* v. *Carey*, 65 U. S. (24 How.) 494. If a gift be to charity, then over to an individual, or to an individual, then over to charity, the rule is effective, and has perfect application. But a gift to charity, then over to charity, forms the exception, and this is sustained upon the reasoning that, as one charitable use may be made perpetual, speaking in a general and natural sense, the gift to two in succession can be of no longer duration or of greater evil. The property is taken out of commerce, and goes instantly into perpetual servitude to charity. While the form of charity may vary, and a succeeding form become effective, contrary to the rule, the primary object, that of charity, continues and is allowable, through the law's regard for charitable uses, and in consideration of the beneficial results flowing therefrom: *Storrs' Agricultural School* v. *Whitney*, 54 Conn. 342 (8 Atl. 141). The exception has even a broader significance. A gift may be made in trust for a charity not in esse, but to come into being at a time uncertain in the future, or which is to take effect upon some contingency that may possibly not happen within a life or lives in being and twenty-one years and nine months afterwards, and it does not contravene the rule, provided there is no gift in the meanwhile

to or for the benefit of any private corporation or person. The doctrine finds support upon the ground that the intention in favor of charity is absolute, the gift and the constitution of the trust is immediate, takes effect in presenti, and the only thing which is postponed or made dependent for its execution upon future and uncertain events is the particular form or mode which the donor would have applied to the execution of the charity.

In *Chamberlayne* v. *Brockett*, 8 Ch. App. 206, a testatrix bequeathed her estate, consisting entirely of personalty, to trustees, upon trust to invest it in consols, and to make out of the dividends certain fixed annual payments for charitable purposes. Among other things, she directed that when and as soon as land should at any time be given for the purpose as thereinafter mentioned, almshouses should be built in three specified places, and that the surplus remaining after their completion should be appropriated in the way of allowances to the inmates. The bequest was held valid as an absolute immediate gift to charity, the mode of execution only being made dependent upon future events. In *Henshaw* v. *Atkinson*, 3 Madd. 306, money was bequeathed to erect a blue-coat school and an asylum for the blind, with directions that lands should not be purchased, but with the expression of an expectation that lands would be given for the charities. It was argued that the bequest could not operate because, as it was said, it was the testator's intention that the charities were not to take effect until lands were supplied by others, and the money might be locked up for an indefinite length of time; but the court was of opinion that the point was not well taken, in view of the rulings in *Attorney General* v. *Lady Downing*, Amb. 550; and *Attorney General* v. *Bishop of Chester*, 1 Brown Ch. 389. The state of facts in the Downing College case was that a testator devised lands to trustees, with directions to purchase with the rents and profits

grounds at Cambridge proper for a college, and to build such structures as should be deemed necessary for the purpose, and to obtain a royal charter for founding such college, and incorporating it by the name of "Downing College" in the University of Cambridge; the trustees to hold the property devised "in trust for the said collegiate body and their successors forever." It was objected that the devise was void, for that there was no cestui que trust in being, and perhaps never might be, for it was at the will and pleasure of the crown to grant the charity or not; but the devise was held valid against the objection: *Attorney General* v. *Lady Downing*, Amb. 550. In the Bishop of Chester case, it appears that Archbishop Secker gave £1,000 to trustees for the establishment of a bishop in the British possessions in America. Lord Chancellor THURLOW ruled that "the money must remain in court until it shall be seen whether any such appointment shall take place," against the objection of Mr. Mansfield that there was neither a bishop in America nor the least likelihood of there ever being one, for which reason it was claimed the legacy was void: *Attorney General* v. *Bishop of Chester,* 1 Brown's Ch. 389. In *Sinnett* v. *Herbert*, 7 Ch. App. 232, the testatrix bequeathed the residue of her personal estate to trustees, upon trust to be applied in the erection or endowing of an additional church at Aberystwith. A question was made as to a possible difficulty touching the time when her intentions could be carried into effect, and it was held that the possible remoteness did not render the gift void. In *Inglis* v. *Sailors' Snug Harbour*, 28 U. S. (3 Pet.) 99, the testator gave an estate, consisting of both real and personal property, to the chancellor of the State of New York, the recorder of the City of New York, and others (naming them in their official capacity), to have and to hold unto themselves and their respective successors in office, but for certain uses and purposes, viz.: to erect an

asylum or marine hospital to be called the "Sailors' Snug Harbour." He evidently intended that the institution thus created should be perpetual, and that the officers named and their successors should forever continue to be the governors thereof, but directed that if such a thing could not be legally done, according to his desires, without an act of the legislature, then that they (the trustees) procure an incorporation to be had for the purposes specified. It was held that the officers named took, not in their official but in their individual capacity, and that the official distinction was a mere designatio personae. But the case was treated as though no particular estate had been provided for, and the disposition under the will was held to be an executory devise. The gift was declared to be valid, and it was said that upon the creation of the corporation the title to the property became vested in it, or that the naked title was held by the heir at law in trust for the corporation.

In a later case in the same court *(Ould v. Washington Hospital*, 95 U. S. 303), it appears that a devise of certain lots was to two persons "and the survivor of them, and the heirs, executors, administrators, and assigns of such survivor," but in trust to hold the same "as and for a site for the erection of a hospital for foundlings, to be built and erected by any association, society, or institution that may hereafter be incorporated by an act of congress as and for such hospital, and, upon such incorporation, upon further trust to grant and convey the said lots of ground and trust estate to the corporation or institution so incorporated, * * * which conveyance shall be absolute and in fee." The corporation was to meet the approval of the trustees, but, if not so approved, then they were to hold upon the further trust until such a corporation as they would approve was created by act of congress. The possible remoteness of the incorporation of such a society by

congress as would meet the approval of the trustees was
held to be no objection to the establishment of the trust.
An obvious analogy was observed between that and the
Sailors' Snug Harbour case.   Mr. Justice SWAYNE says:
"There, as here, a future corporation was necessary to give
the devise effect.   There, as here, there was a possibility
that such a corporation might never be created.   In both
cases the corporation was created, and the intention of the
testator carried into full effect.   It is a cardinal rule in the
law of wills that courts shall do this whenever it can be
done.   Here we find no impediment in the way.   The gift
was immediate and absolute, and it is clear beyond doubt
that the testator meant that no part of the property so
given should ever go to his heirs at law, or be applied to
any other object than that to which he had devoted it by
the devise here in question."   But without going further
into authorities, we cite in support of the proposition,
*McDonogh's Executors* v. *Murdoch*, 65 U. S. (15 How.) 367;
*Sanderson* v. *White*, 18 Pick. 328 (29 Am. Dec. 591); *Russell* v. *Allen*, 107 U. S. 163 (2 Sup. Ct. 327); *McIntire Poor
School* v. *Zanesville Canal Co.*, 9 Ohio, 203 (34 Am. Dec.
436); *Miller* v. *Chittenden*, 2 Iowa, 315; S. C. 4 Iowa, 252;
*Odell* v. *Odell*, 10 Allen, 1; *Jones* v. *Habersham*, 107 U. S.
174 (2 Sup. Ct. 336);  2 Perry on Trusts, § 736;  *Christ's
Hospital* v. *Grainger*, 16 Sim. 83; 1 Jarman on Wills, *262,
note; *Crerar* v. *Williams*, 145 Ill. 625 (34 N. E. 467, 21 L.
R. A. 454); *Webster* v. *Morris*, 66 Wis. 366 (57 Am. Rep.
278, 28 N. W. 353).   These cases involve, indiscriminately,
bequests and devises, showing that the rule is not different
whether real or personal property is the subject of the
testator's bounty.   See in this connection 2 Washburn on
Real Property, *375, subd. 6.   In the Chamberlayne case,
as well as some others, the point was made that if the gift
had been to take effect upon a remote contingency, the
rule against perpetuities would have been as applicable as

to any other estate depending for its coming into exist-
ence upon a condition precedent.   If the condition is never
fulfilled, or if it is so remote and indefinite as to transgress
the limits of time prescribed by the rules of law against
perpetuities, the gift fails ab initio; but "when," says Lord
Chancellor SELBORNE, "personal estate is once effectually
given to charity, it is taken entirely out of the scope of the
law of remoteness."  The question here determined was
not combatted with great confidence by appellants at the
argument, but we have gone into the consideration of it
thus at length, and for this we may be pardoned, because
it is deemed to have a special bearing upon the cardinal
question.

We will now consider the nature and capacity of the
trustee which the testator has attempted to create and
clothe with perpetuity or longevity co-equal in point of
existence with the charity he has endeavored to establish.
We can best reach a satisfactory result by a review of the
authorities, and then apply the deductions to the facts of
the case.   There is a class of cases of which *Inglis* v. *Sailors'*
*Snug Harbour* is perhaps the leading one, the facts for an
understanding of which have been heretofore sufficiently
stated.   It seems to have been intimated by the justice
who wrote the prevailing opinion that if the devise had
been to the officers named in the will in their official
capacity, and their successors, to execute the trust, with-
out the contingent provision for the creation of the incor-
poration, the case would have fallen within the principle of
*Philadelphia Baptist Association* v. *Hart's Executors*, 17 U.
S. (4 Wheat.) 1.   Whether this was a method of passing
the point simply, and resting the case upon a more satis-
factory basis, or whether the Baptist Association case was
taken as decisive of the question, it is difficult to tell from
the opinion.  At any rate, it was finally determined that
the will could be sustained as an executory devise to a

corporation to be created in the future, the devise to take
effect upon the contingency of the creation of the cor-
poration, and that the contingency was not too remote.
Mr. Justice STORY was of the opinion that the officers
named took in their official capacity, and that the devolu-
tion of the property was to their successors, and so on
in perpetual succession, and that it was perfectly com-
petent for them to take and hold as trustees in such a
capacity.  In this connection it may be said that the Bap-
tist Association case involved a devise to a voluntary unin-
corporated association, to take in trust and manage as a
perpetual fund, and it was held, Chief Justice MARSHALL
announcing the opinion of the court, that the devise did
not create a valid trust to charity, upon the ground that
the association was incapable of taking.  It was further
decided that the devise was not to the individuals com-
posing the association, as nothing was intended to pass to
them but the trust, and they were not authorized to exe-
cute as individuals.  It was thought also that a subsequent
incorporation of the society would not cure the defect.
*Ould* v. *Washington Hospital* is so nearly like the Sailors'
Snug Harbour case that Mr. Justice SWAYNE remarked
the analogy between the two.  It being held that the
officers in the Snug Harbour case took as individuals, it
would seem that the analogy was perfect as it respects the
preliminary provisions for the trust.  In the Washington
Hospital case the devise was to individuals and their heirs,
executors, assigns, etc.  Although the Snug Harbour case
was treated as if the devise to the officers named was not
contained in the testament, and the will was sustained as
an executory devise to a corporation to come into being,
without a particular estate to support it, it is not clear
why it should not have been upheld as an executory devise
as well, under the rule that the devisor had parted with
his whole estate to the officers named, they taking as indi-

viduals, but upon a contingency that qualified the disposition of it, and limited the estate upon that contingency (4 Kent's Commentaries, *268); or, perhaps, speaking more accurately, why it might not have been treated as a conditional limitation of the estate vested in the trustees, as Mr. Justice SWAYNE characterized the Washington Hospital case. In the latter case the gift was declared to have been immediate and absolute; and if such was the case there, it is difficult to see why it was not so in *Inglis* v. *Sailors' Snug Harbour*, upon the theory that the officers took as individuals. If the doctrine in the Washington Hospital case is right, and it is believed to be the better exposition, then the gift to charity in either case did not depend for its validity or establishment upon the contingency of the creation of the corporation provided for, and hence was immediate and absolute. In *Russell* v. *Allen*, 107 U. S. 163 (2 Sup. Ct. 327), lands and personalty were granted "for the purpose of founding an institution for the education of youth in St. Louis, Missouri," to one Horner and his successors, in trust, "for the use and benefit of the Russell Institute of St. Louis, Missouri," with directions to the grantee to sell them, and to account for and pay over the proceeds "to Thomas Allen, president of the board of trustees of the said Russell Institute," and it was held that the gift was valid as a charity, against the donor's heirs and next of kin, although the institute was neither established nor incorporated in the lifetime of the donor or of Allen, the reputed president of the board of trustees. In conformity with the trust, Horner paid and conveyed to Allen a large amount of money and lands, and the money and lands in the hands of Allen and his executors were considered to have been charged with the same charitable trust to which they were subject in the hands of Horner: See also *Trustees of Cory Universalist Society* v. *Beatty*, 28 N. J. Eq. 570; *Crerar* v. *Williams*, 145 Ill. 6?

(21 L. R. A. 454, 34 N. E. 467); *Coit* v. *Comstock*, 51 Conn. 352.

Another class of cases, of which *Vidal* v. *Girard's Ex.*, 43 U. S. (2 How.) 126, is the leading authority, establishes the doctrine that where a municipal corporation has capacity under its charter to take and hold such property as is made the subject of the trust, it may take and hold the same upon trust in the same manner and to the same extent as a private person may do. However, if the trust be repugnant to or inconsistent with the proper purposes for which the corporation was created, it would not be compelled to execute it; but this condition will furnish no ground to declare the trust itself void, if otherwise unexceptionable. In such case, the trust having fastened itself upon the property, a court of equity will appoint a new trustee to enforce it: See also *Perin* v. *Cary*, 65 U. S. (24 How.) 494; *McDonogh's Executors* v. *Murdoch*, 56 U. S. (15 How.) 367; *Chambers* v. *City of St. Louis*, 29 Mo. 543; *Board of Commissioners of Rush Co.* v. *Dinwiddie*, 139 Ind. 128 (37 N. E. 795); *Skinner* v. *Harrison Township*, 116 Ind. 139 (2 L. R. A. 137, 13 N. E. 529); *Dailey* v. *City of New Haven*, 60 Conn. 314 (14 L. R. A. 69, 22 Atl. 945).

There is another class of cases of which the *Baptist Association* v. *Hart's Executors*, 17 U. S. (4 Wheat.) 1, is a type, among which the views expressed are not uniform. This class involves bequests or devises to voluntary unincorporated societies. As we have seen, it was held in the Baptist Association case that such a devise was void for want of capacity to take as a trustee. The holding has not escaped criticism in later adjudications, and it may be said to be distinguishable by the fact that the supposed trust arose under the laws of Virginia, which, as measured by the adjudications there, recognize no distinction between charitable and other trusts: *Russell* v. *Allen*, 107 U. S. 163 (2 Sup. Ct. 327); *Kain* v. *Gibbonev*, 101 U. S. 362;

and *Jackson* v. *Phillips*, 14 Allen, 588. In *Magill* v. *Brown*, Brightley N. P. 347, 348, a case in the Circuit Court of the United States for the eastern district of Pennsylvania, Mr. Justice Baldwin, with whom Judge Hopkinson, the district judge, concurred, held that devises to the Monthly and Yearly Meetings of Friends in Philadelphia, voluntary unincorporated religious societies, as trustees to administer charity, were operative and valid. Sharswood, J., in *Zeisweiss* v. *James*, 63 Pa. St. 465, 3 Am. Rep. 558, says: "No doubt an unincorporated society may be a trustee, invested with such a discretion (to appoint the charity), and may perpetuate itself by the succession of its members," citing in support thereof *Magill* v. *Brown*; *Domestic and Foreign Missionary Society's Appeal*, 30 Pa. St. 425; and *Evangelical Association's Appeal*, 35 Pa. St. 316. It will be noted that these are cases arising in Pennsylvania, and that the peculiar religious associations known as the "Monthly and Yearly Meetings of Friends" are considered as a body politic or corporate by prescription, possessing and enjoying the franchise of succession, with the same rights of property, as natural persons do by inheritance: *Magill* v. *Brown*, Bright, 347, 348. In *Bartlett* v. *Nye*, 4 Met. (Mass.) 378, a devise of real estate to an unincorporated society for charitable uses was considered to be valid; but it was held that in such case the estate descended to the heirs of the testator subject to the trust created by the testament, which they were bound to execute, and that a court of equity will enforce the observance and due execution upon their part. This is in accord with the idea that the trust has become fastened to the property, and that the court will compel its observance in whatsoever hands it may come. The same rule was applied to a bequest of personal estate, in the hands of executors: *Burbank* v. *Whitney*, 24 Pick. 146 (35 Am. Dec. 312). The rule is the same in Connecticut, *Am. Bible Society* v. *Wet-*

*more,* 17 Conn. 181; and in Iowa, *Byers* v. *McCartney,* 62 Iowa, 339. See also *Bliss* v. *Am. Bible Society,* 2 Allen, 334.

. We come now to a class of cases wherein the testator has appointed trustees and has attempted to devise the manner of their perpetuation as a board. In *Treat's Appeal from Probate,* 30 Conn. 113, the bequest was to sundry persons named, and to their successors forever, "who shall as a board of trustees add to and perpetuate their number, so long as in their opinion the objects of this bequest shall require the existence of the same." It was argued that the trustees were not a body corporate, and, having no legal successors, except so far as they might be appointed from time to time by themselves, the trust might fail for want of persons to uphold the title. The court held to the contrary upon the authority of the *American Bible Society* v. *Wetmore,* 17 Conn. 181, which was a devise to an unincorporated religious society, saying "a trust never fails for the want of a trustee." It appears to have been assumed that so long as the board was kept full by the appointment of their successors, no question could arise respecting their power and authority to administer the charity. Somewhat analogous to the case is *Heuser* v. *Harris,* 42 Ill. 425. A devise was made of lands to be sold, one-half the proceeds to go to a certain school district, and to be used for school purposes only, to be under the control of a trustee to be elected by the "people" for a term of four years. It was held that the school district had the capacity to take, and that in case the people should fail to elect a trustee, chancery would supply one, and the trust would not fail for the want of one. *Seda* v. *Huble,* 75 Iowa, 429, 9 Am. St. Rep. 495, is a case where a bequest was made to two persons, naming them, with directions that they and their successors should invest the fund for the benefit of a church. The trustees named were presumably some officers of an unincorporated voluntary society. The

bequest was sustained as being to the parties and not to the church, and the doctrine reiterated that a trust would not be permitted to fail through the failure of a trustee. In *Estate of Hinckley*, 58 Cal. 457, provision was made in the will for filling vacancies in the board of trustees by "an election, duly notified, in which election each of the trustees of said religious society (First Unitarian Society of San Francisco) and each of the trustees of this fund shall be entitled to one vote," and no question was made touching the capacity of the board to administer the charity, which was to constitute a perpetual fund to be called "The William and Alice Hinckley Fund." It so happens, at times, that individuals are appointed to administer a charity without any provision for perpetual succession, and yet the donation is not allowed to fail by reason of the fact that the charity will outlive the trustee: *Brown* v. *Brown*, 7 Or. 285, was a devise to individuals as trustees, to hold in perpetuity, which it was held constituted a donation to charity, and yet the devise was sustained without any provision for perpetual succession of trustees to administer the trust.

There are yet other cases which go further toward supporting, upholding, and maintaining the charity than any of these. In *Hunt* v. *Fowler*, 121 Ill. 269 (12 N. E. 331), the testatrix's codicil contained this clause: "All the rest and residue of my estate, including that which may lapse from any cause, I direct to be invested or loaned upon the best terms possible, so as to produce the largest income, and said income to be distributed annually among the worthy poor of the City of La Salle, in such manner as the court of chancery may direct." No trustee was appointed, but, as the distribution of the fund was expressly referred to a court of chancery, and it was held that the power of distribution carried with it the power to select the individuals to whom the distribution should be made,

a trustee was appointed by the court in effect to be a trustee of the testatrix's appointment. In *Witman* v. *Lex*, 17 Sug. & R. 88 (17 Am. Dec. 644), the court say: "It is immaterial whether the person to take be in esse or not, or whether the legatee were at the time of the bequest a corporation capable of taking or not, or how uncertain the objects may be, provided there be a discretionary power vested anywhere over the application of the testator's bounty to those objects." This doctrine is reiterated with approval in *Vidal* v. *Girard's Executors*, 43 U. S. 126. And such bequests as "to the poor of Madison County," and to the "suffering poor of the town of Auburn," without any appointment of trustees to administer the trust, have been held to be a sufficient donation to charity, and that the court would appoint trustees to execute the trust: *Heuser* v. *Harris*, 42 Ill. 425; and *Howard* v. *American Peace Society*, 49 Me. 288. These cases, however, seem to have been decided upon authorities which would indicate that there had not been a due discrimination between the ministerial function of the English chancery, employed to administer the arbitrary power of the king as parens patriae, and that which was exercised in a purely judicial capacity. However, a bequest "to the Sunday School of the Methodist Episcopal Church at Tuckerton" has been maintained, and the church to which the Sunday School was an adjunct, being a corporation, was appointed a trustee in equity, and that without reference to the English authorities: See *Mason's Executors* v. *Trustees of M. E. Church*, 27 N. J. Eq. 47. These latter cases carry the doctrine to the very verge. The following principles are settled in Tennessee: "First, that trusts for charitable uses should be favored by courts of equity; second, that where the object of charity is definite, and it is to be administered by trustees, it will be sustained; third, that, although the objects may be too indefinite for a court of

chancery to undertake to administer it, yet if a trustee capable of taking the trust be named, and clothed with the necessary powers and discretion for carrying out the charity, it will be upheld": *Heiskill* v. *Chickasaw Lodge*, 87 Tenn. 668 (4 L. R. A. 699, 11 S. W. 825).

The citation of these authorities from those states, such as Oregon, which recognize the distinction between charitable and ordinary trusts, is sufficient to demonstrate beyond cavil that it is the policy of the law to uphold and give effect to donations to charity whenever it can be done under any reasonable construction of the instrument by which the charity is attempted to be established. Charity is still, as under the English chancery practice, a favorite of equity, and, while in this country there has been much modification of the rules governing charitable donations, and perhaps a radical narrowing of the jurisdiction (see 2 Perry on Trusts, §§ 729, 731), the conscience of the court is always exercised to see that the charity is administered, if it can be done within the rules of the established law of the forum. The general rule everywhere is, whether speaking with reference to ordinary or charitable trusts, that a valid trust will never be permitted to fail for want of a trustee. This, of course, implies the existence, in the first instance, of a valid trust. But where there is an appointment of a trustee competent to take, and the other conditions of the trust are commensurate to give it validity, there can be no doubt that the property itself becomes impressed with the trust, and a subsequent failure of a trustee will not relieve it of this condition. So, if a donation to charity is immediate and absolute, and a trustee is appointed competent to take, the other conditions being sufficient, a trust arises at once, the property becomes impressed with it, and passes beyond the reach of the heirs or residuary legatees or devisees. The title is effectually diverted from its natural channel of devolution,

in so far as it may be affected by reason of the necessity of a competent trustee as an ingredient to a valid trust.

Now, to the purposes of this case: The executors appointed are trustees charged with the duty of executing in part the scheme adopted by the testator for the administration of the charity intended to be established. After the administration of the estate, they are to use the remainder of the money coming into their hands at the death of the testator, together with the rents of the real property, which they are charged with leasing, in the erection of buildings for school purposes, on block 29, loaning the funds, etc. A direct and explicit execution of the trust is given into their charge—not to carry out the scheme in its utmost detail, but to carry it forward for the space of some eighteen years, until it should go into the hands of other trustees, designed to be a permanent board for the perpetual administration of the trust. Now, can there be any question but what there was here an immediate and absolute donation to charity, with the appointment of trustees perfectly competent to take? Certainly not. The estate passed from the testator to the trustees direct. It never vested in the heirs, and the trust does not depend for its validity or establishment upon the performance of any condition or the happening of any event. The donation was in praesenti, and the estate vested at once in the trustees. The trust became fastened upon the property when the will took effect. But it is claimed that the scheme for administering the trust is impracticable, as the board of trustees which it was intended should succeed to the trust may never be established, inasmuch as the judges named are not compellable to appoint the members thereof, and even if appointed they would not constitute such a body known to law as having perpetual succession, and therefore could not administer the charity. We quite agree with the coun-

sel that the judges may create the board or not as they see fit. It was designed that the judges in office for the time being should exercise the power of appointment, but in doing so they would not be acting in the exercise of their judicial functions, as it is no part of the duties enjoined upon them by law. They must, therefore, act, if at all, in an individual capacity. Should they appoint, the board would be an aggregation of individuals, not a single entity capable of acting as an official body, and we see no reason why the board may not be kept full and maintained perpetually by the judges named, and be perfectly competent as individuals to execute the duties required of them. It will be borne in mind that the judges are authorized and empowered to appoint the trustees, not to use a discretion to name and appoint the objects of the charity or to create a definite charity. They are invested with no discretion or power whatever as it respects this feature of the trust. They take no property interest in any capacity, either as individuals, trustees, or otherwise, nor are they empowered to devise a scheme for the administration of the charity. The testator has not only appointed his own scheme of charity, to wit: the establishment of a free school or schools for the children of the district embracing the town of St. Johns, but he had prescribed with some particularity and detail a scheme or plan of administering the charity thus appointed. There is manifestly a distinction between the scheme of charity and a scheme for administering it: See *Webster* v. *Morris*, 66 Wis. 396, 397 (57 Am. Rep. 278, 28 N. W. 353). The power given the judges to formulate rules for the government of the board may enable them to direct in some measure the particular manner of carrying out the scheme for its administration, but it can in no way impinge upon, change, or modify the nature of the charity which the testator has sought to establish, nor can they in any way modify the

manner of administration wherein the testator has partic-
ularized; and it is believed that this clause of the will can
hardly be construed as giving the judges supervisory con-
trol over the board of trustees in the direction of the trust.

To reinforce the point, we cite by way of illustration
*Fontain* v. *Ravenel*, 58 U. S. (17 How.) 369. There "the
executors, or the survivors of them, after the decease of
testator's wife, were to dispose of the property for the use
of such charitable institutions in Pennsylvania and South
Carolina as they or he may deem most beneficial to man-
kind." The executors died before the testator's wife. It
was held that, the testator having delegated this power of
appointing the particular charity to the executors, and the
conditions upon which they were authorized to exercise
their discretion having failed, the court was without juris-
diction to appoint others to exercise a discretion which
was personal to those named by the testator. The ques-
tion there involved a selection of the objects of charity,
which the testator had failed to do; here it involves the
manner of its execution, with the object definitely desig-
nated and pointed out. The failure of the judges designated
to exercise the power delegated to them would simply
result in a failure of trustees, in which event a court of
equity would certainly not allow the trust to fail. In
*Heuser* v. *Harris*, 42 Ill. 425, the donation was, as we have
seen, to a school district, to be used for school purposes,
and to be under the absolute control of a trustee to be
elected by the people; and it was held that a court would
appoint after the failure of the people to elect. The power
to appoint by the people was a delegated power, and so
it is here; the power of appointment of trustees by the
judges under the will is delegated, and the failure to ap-
point in the present case could be no worse for the charity
than the failure of the people to elect in the former. The
citation of another case will suffice. In *Dailey* v. *City of*

*New Haven,* 60 Conn. 314 (14 L. R. A. 69, 22 Atl. 945), the devise or bequest was one-fifth of the remainder "to the City of New Haven, to be held in trust by the proper authorities, and the income to be applied through such agencies as they may see fit, to supply fuel and other necessaries to deserving indigent persons, not paupers, preferring such as are aged and infirm," and one-fifth "to the president and fellows of Yale College, in trust, the income to be applied to the support of scholarships, or to such other purposes in the academical department as they may deem expedient." The City of New Haven refused to accept its trust, nor was it competent to take in such capacity, and from a survey of the will it was adjudged that the primary purpose of the testator was to appropriate the particular one-fifth of the residue of his estate to a particular charitable object specifically pointed out, and that the form of its administration was secondary only, and new trustees were appointed to administer it. But as to the Yale College donation, it was said: "Some of the trusts were in effect, and evidently so intended, gifts to the trustees. The question whether it would be of advantage to the trustee to accept or not was the only question, and a refusal might properly end the matter. Certainly the bequest to the president and fellows of Yale College to the support of scholarships, or such other purposes in the academical department as they may deem expedient, is of that nature. The direct benefit is to the college. By its very terms the trust is incapable of being administered by another." The primary object of the testator here, as gathered from the testament, is to establish and maintain a free school or schools in the town of St. Johns. His scheme of charity is fixed and definite, the manner of administering the trust is of secondary importance. He has indicated a method for its application, but it is not within the ken of human ingenuity to devise a plan that

may be observed in every particular in its execution, so that, if his particular method of administration should fail in some particular, that would not give reason for voiding the trust. For instance, it is directed that the principal of the fund to arise shall be loaned only upon real estate security. Now, if that particular form of security should fail or become unavailable, the trustees might be authorized to loan upon other sufficient securities without impairment of the trust: See *McIntire's Administrators* v. *City of Zanesville*, 17 Ohio St. 352. So it is of other specifications and directions touching the mode or manner of executing or administering the charity. We think it clear, therefore, that the trust should not fail by reason of the fact that the judges may not appoint the board of trustees designed by the testator to succeed the executors in the control and management of the estate funds, and prescribe rules for their government, nor because the board may not be a body of perpetual succession: See *Gould* v. *Taylor Orphan Asylum*, 46 Wis. 106 (50 N. W. 422); and *Dodge* v. *Williams*, 46 Wis. 70-101, 102 (50 N. W. 1103).

It is objected to the validity of the trust that the Circuit Court of the State of Oregon for Multnomah County, in which jurisdiction St. Johns is situated, now has four judges instead of one. Who shall appoint? Counsel say, "Manifestly neither of them, because neither of them is *the* judge. Each one of them is *a* judge, or one of the judges, but not *the* judge." It is probable, however, that an appointment by either of these judges would suffice. Surely an appointment by either would fulfill the conditions of the particular manner of executing the trust. But, should the fact of a multitude of judges prevent the appointment entirely, we have seen that the trust should not fail. The condition that the judges should appoint was not a condition precedent to vesting the right.

Another objection urged is that the district embracing the town of St. Johns has been changed as it respects the boundaries thereof, and rechanged, and is liable to be changed again; but the testator seems to have contemplated just such a condition of things, and the children of the district, whatever territory it may comprise, are the objects of the charity: See *McIntire* v. *City of Zanesville*, 17 Ohio St. 352; and *Heuser* v. *Harris*, 42 Ill. 425.

Again, it is urged that the trust must fail as it affects block 29, because no provision appears to have been made for its conveyance by the executors to the board of trustees provided for. It is not clear but that there may have been an oversight in providing the manner by which this particular piece of property should pass to the board. It was the evident intention of the testator that this block should pass to the succeeding trustees; but, if it be admitted that the manner of its devolution has not been specially provided for, it would pass either to the heirs of the executors or result to the heirs of the testator, but in either event it would he charged with the trust, and equity would place it in the proper channel of administration. It is said in the Sailors' Snug Harbour case: "The will looks therefore to three alternatives: 1. That the officers named in the will as trustees should take the estate and exercise the trust. 2. If that could not legally be done, then he directs his trustees to procure an act of incorporation, and vests the estate in it for the purpose of executing the trust. 3. If both these should fail, his heirs, or whosoever should possess and enjoy the property, are charged with the trust. *   *   * Whoever, therefore, takes the land takes it charged with these uses and trusts which are to be executed in the manner above mentioned." What the testator has said in his will to the effect that the buildings should belong to his estate, was evidently for the purpose of making it clear that he did not intend a donation to the

school district which shall embrace the town of St. Johns. And the direction that the school or schools should never be used to inculcate the doctrines of any religious sect or denomination, one more than another, is one that was perfectly competent for him to make. As to this last see *Ould* v. *Washington Hospital*, 95 U. S. 303.

Much has been said concerning the cy pres doctrine, but it is not apparent how it can affect this case at the present time. We have seen that the appointment of the objects of charity is a matter not personal with the judges designated to nominate the board of trustees, and much less is it personal to the executors or trustees themselves. There has been no failure of the object for which the donation was made; there is no unexpected undisposed-of surplus; no increase of funds beyond that which is needed for the purposes designed; no change in the law rendering the object unlawful; nor have there been any intervening circumstances by reason of which it has become apparent that the trust cannot be executed strictly. There may come a time when this doctrine may be invoked, but with what effect it is not now within our province to decide. The decree of the court below will be affirmed.

AFFIRMED.

## ON MOTION TO CORRECT DECREE.

PER CURIAM. This is an application by Eli Morrill for the recall of the mandate issued in this cause with a view of procuring a modification of the decree of this court entered against him on December 31, 1896, as surety upon the appellant's undertaking which it is alleged was by mistake entered for an amount in excess of his liability. The proceeding was commenced in the County Court for Multnomah County, and after a decree there in favor of respondent was appealed to the Circuit Court, and Eli Mor-

rill and John Burk became sureties upon the undertaking for the appeal conditioned that "appellants shall and will well and truly pay all damages, costs, and disbursements which may be awarded against them on said appeal, and that, if said judgment be affirmed, the appellants will satisfy it so far as affirmed." The Circuit Court affirmed the decree of the County Court, and the same parties appealed to this court, and gave an undertaking with John Burk and E. J. Jeffery as sureties. This court affirmed the decree of the Circuit Court, and further decreed that the respondent have and recover of and from Eli Morrill, John Burk, and E. J. Jeffery, his costs and disbursements on appeal from the Circuit Court to this court, taxed at $98.50, together with the costs and disbursements in the two lower courts, subsequently taxed at $119.50.

The question presented is whether Morrill was liable upon his undertaking for the costs and disbursements incurred on appeal from the Circuit Court. We think not. Morrill's undertaking is decisive of the question. He was bound to the observance of two conditions: First, that appellants should pay all costs and disbursements awarded against them on said appeal, that is to say, upon the appeal from the County to the Circuit Court. This condition is not broad enough to comprehend costs and disbursements incurred in the appeal from the Circuit to the Supreme Court, so that Morrill is not liable for the costs of the Supreme Court under this condition. Second, that appellants will satisfy said judgment so far as affirmed. What judgment? The judgment or decree of the County Court, and this included the costs incurred in that court, as they were comprehended by that decree, and none other. The decree of the County Court was affirmed here; so was also the decree of the Circuit Court which includes the costs on appeal from the County to the Circuit Court. For all this, Morrill is liable under the two conditions of his under-

taking. But the conditions, by the most liberal construction, cannot extend to the costs and disbursements on appeal to this court. They are neither costs and disbursements on appeal to the Circuit Court, nor are they any part of the judgment or decree of the County Court. In support of this view see *Hinckley* v. *Kreitz*, 58 N. Y. 583. The decree having been thus entered by inadvertence, the mandate will be recalled and the decree will be corrected so as to relieve Morrill from liability for costs and disbursements on appeal from the circuit to this court.

DECREE MODIFIED.

Decided at PENDLETON July 31, 1897.